UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| HOPE BROUSSARD | CIVIL ACTION NO. 04-2147 |
| --- | --- |
| VS. | MAGISTRATE JUDGE METHVIN |
| COMMISSIONER OF SOCIAL SECURITY | BY CONSENT OF THE PARTIES |

## MEMORANDUM RULING

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, the Commissioner's decision is **AFFIRMED IN PART AND REVERSED IN PART.**

### *Background*

Born on March 15, 1966, Hope Broussard ("Broussard") is currently 39 years old. Broussard has a 9th grade education as well as a GED and has worked in the past as an office clerical worker, printing company laborer, and cook/helper at a daycare center. On March 31, 1999, Broussard was in an automobile accident which left her with severe back injuries. Although she attempted to return to work at the daycare center following the accident, Broussard was unable to do any heavy lifting and was forced to quit that job. She underwent a lumbar diskectomy and fusion in February 2000 and she has not worked since that time. Broussard was in another accident in August 2002, which re-injured her back and neck.

Broussard filed applications for a period of disability, disability insurance benefits, and supplemental security income benefits on August 14, 2000, alleging disability as of February 1, 2000 due to status-post back surgery, back and neck pain, and depression. The application was denied initially and on reconsideration. In a decision dated March 23, 2003, an administrative

law judge (ALJ) determined that Broussard was disabled for a closed period from February 1, 2000 to March 31, 2001, but that after March 31, 2001, she had the residual functional capacity to perform light work with certain restrictions. A request for review was denied by the Appeals Council on August 16, 2004. (Tr. 5-7). This suit was then timely filed.

### *Assignment of Errors*

Broussard raises the following errors on appeal: (1) the ALJ erred in failing to apply the proper standard for determining when she achieved "medical improvement;" (2) the ALJ erred in failing to find that she suffered from a severe mental impairment; and (3) the ALJ improperly relied upon the testimony of the vocational expert in finding that she was not disabled after March 31, 2001.

### *Standard of Review*

This court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id.; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Id.

## *The ALJ's Decision*

In the Benefits Review Act of 1984, 42 U.S.C. § 423(f), Congress established specific standards for the termination of disability benefits. Pursuant to the standards, the Secretary may terminate disability benefits if substantial evidence demonstrates that: (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity. *See* § 423(f)(1); Griego v. Sullivan, 940 F.2d 942, 944 (5th Cir.1991). The burden of proof lies with the Secretary in termination proceedings. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Griego v. Sullivan, 940 F.2d 942, 944 (5th Cir.1991).

The first part of the evaluation process focuses on medical improvement. The implementing regulations define a medical improvement as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs, and/or laboratory findings associated with your impairment(s)." And a medical improvement is only related to an individual's ability to work "if there has been a decrease in the severity ... of the impairment(s) present at the time of the most recent favorable medical decision and an increase in your functional capacity to do basic work activities." 20 C.F.R. § 404.1594(b)(3).

The second part of the evaluation process relates to the ability to engage in substantial gainful activity. Here the implementing regulations incorporate many of the standards set forth

in the regulations governing initial disability determinations. See 20 C.F.R. § 404.1594(b)(5) and (f)(7). The difference is that the ultimate burden of proof lies with the Secretary in termination proceedings. Griego v. Sullivan, 940 F.2d at 944. In evaluating the ability to engage in substantial gainful activity, the Secretary considers, first, whether the claimant can perform past relevant work and, if not, whether the claimant can perform other work. 20 C.F.R. §§ 404.1594(f)(7) and (f)(8).

In determining whether a claimant has regained the capacity to perform substantial gainful activity, the Secretary uses an eight-step sequential analysis:

> 1. If a claimant is engaged in substantial gainful activity, disability will be found to have ended regardless of the medical findings.
>
> 2. If the claimant's impairment meets the severity of an impairment listed in Appendix I, his disability will be found to continue.
>
> 3. If the impairment does not meet the Appendix 1 listings, whether there has been medical improvement as shown by a decrease in medical severity must be determined. If so, Step 4 is considered. If there has been no decrease in medical severity, there has been no medical improvement, and Step 5 is considered next.
>
> 4. If medical improvement is found, whether the improvement is related to the claimant's ability to do work must be considered. To make this determination, whether or not there has been an increase in the residual functional capacity based on the impairment that was present at the time of the most recent favorable medical determination must be considered.
>
> 5. If it is found at Step 3 that there has been no medical improvement or at Step 4 that the medical improvement was not related to the claimant's ability to work, a determination as to whether the exceptions apply must be made. If none apply, disability will be found to continue. If one of the first group of exceptions to medical improvement applies, Step 6 is considered. If an exception in the second group of exceptions to medical

improvement applies, the claimant's disability will be found to have ended.[1]

6.  If medical improvement is shown to be related to the claimant's ability to do work or if one of the first group of exceptions to medical improvement applies, whether all the claimant's current impairments in combination are severe must be determined. The evidence shows that the current impairments in combination do not significantly limit the claimant's physical or mental abilities to do basic work activities, the impairments will not be considered severe and the claimant will no longer be considered disabled.

7.  If the impairment is severe, and a claimant can still perform his past work, disability will be found to have ended.

8.  If a claimant's impairment prevents him from performing his past work, other factors including his age, education, past work experience, and residual functional capacity are considered to determine if other work can be performed.

20 CFR Sec. 404.1594(f)(1-8)(1993).

In the case at bar, the ALJ found that Broussard suffers from the severe impairments of neck and back pain, and that she was disabled between February 1, 2000 and March 31, 2001 and entitled to benefits for her impairments during that closed period. However, the ALJ further found that, after March 31, 2001, Broussard had the residual functional capacity to perform light work with certain restrictions. The ALJ also concluded that Broussard's depression is not a severe impairment. In so concluding, the ALJ utilized the five-step sequential procedure set

---

[1] The second group of exceptions to medical improvement may be considered at any point in this process. They include:
   (1) A prior determination was fraudulently obtained;
   (2) The claimant does not cooperate with the SSA;
   (3) The SSA was unable to find the claimant; and
   (4) The claimant fails to follow prescribed treatment.
20 C.F.R. §404.1594(e)(1-4).

forth in 20 C.F.R. §404.1520(b)-(f) (1992), and made no reference to the standard for analyzing medical improvement claims.

### *Findings and Conclusion*

After a review of the entire record and the briefs of the parties, and pursuant to 42 U.S.C. §405(g), the court concludes that the Commissioner's finding of non-disability as of March 31, 2001 is not supported by substantial evidence of record.

### I. Medical History

#### *Physical Impairments*

On March 31, 1999, Broussard was involved in an automobile accident in which she was rear-ended by another vehicle and sustained serious neck and back injuries. Broussard was initially treated by Dr. Keith Mack, a family physician. On June 9, 1999, Dr. Mack reported that Broussard had back pain and stiffness with decreased range of motion of the lumbar spine and paraspinous muscle spasm present in the lumbar level. (Tr. 126). Although Dr. Mack believed that Broussard was slowly improving, he continued her on medication and referred her to Dr. Louis Blanda, an orthopedic surgeon. (Id.).

X-rays of Broussard's cervical spine taken on July 30, 1999 showed loss of normal cervical lordosis reflecting spasm, while x-rays of Broussard's lumbar spine showed minimal hypertrophic spurring of some lumbar bodies. (Tr. 106). X-rays of Broussard's thoracic spine showed a slight S-shaped dorsal scoliosis. (Id.). An MRI of Broussard's cervical spine taken on August 16, 1999 showed reversed lordosis at the C5-6 level, as well as a right paracentral disc herniation at that level, which appeared to contact and indent the right ventral surface of the cord

slightly. No canal stenosis was evident. A subtle bulge was also detected at the T3-4 level. (Tr. 107).

Dr. Blanda began treating Broussard in August 1999. On September 30, 1999, Dr. Blanda reported that Broussard had palpable spasm in the neck area, as well as a weakly positive straight leg raising test. (Tr. 164). In January 2000, Dr. Blanda reported that Broussard's back pain continued to be severe, and he recommended surgery. (Tr. 161). Dr. Blanda referred Broussard to Dr. James N. Domingue, a neurologist, for a neurological examination.

On January 11, 2000, Dr. Domingue examined Broussard and reported that his review of her MRIs of the cervical and lumbar spine showed central disc herniation at L5-S1 without definite nerve root compression; dessication of the disc at L4-5 and L5-S1; a minimal bulge at L4-5; and a small anterior bulge at C5-6. January 14, 2000, Dr. Domingue reported that EMG and nerve conduction studies of Broussard's legs and low back were normal. (Tr. 109). Dr. Domingue noted that Broussard had "significant disease at L5-S1," but that she did not have any neurological impairments causing her pain. Dr. Domingue deferred the issue of whether Broussard required surgery to Dr. Blanda. (Id.).

On February 21, 2000, Broussard underwent a lumbar laminectomy and microdiskectomy at L5-S1, as well as a fusion at L5 using pedicle screw fixation. (Tr. 131). On March 23, 2000, Dr. Blanda reported that postoperative x-rays "look[ed] good." (Tr. 158). Three months later, Broussard complained to Dr. Blanda of continued back pain, right shoulder pain, and numbness in her hand. On exam, there was mild spasm in her neck. (Tr. 157). Dr. Blanda noted that Broussard might need further surgery. (Id.). On October 26, 2000, Dr. Blanda reported that x-rays of the lumbar spine showed that the fusion was healing, but that Broussard would eventually

need anterior cervical diskectomy and fusion surgery ("ACF surgery") at C5-6 to alleviate her continued pain.[2] (Tr. 155).

At the request of Disability Determinations Services, Broussard was examined by Dr. Harold A. Heitkamp, a general surgeon, on March 16, 2001. Dr. Heitkamp reported that Broussard had tenderness in her lumbar sacral spine on the right and left at L4-5 and L5-S1. Range of motion of the lumbar sacral spine was decreased at 35 degrees for forward flexion (normal 90), 15 degrees for extension (normal 30), 20 degrees for left lateral flexion (normal 30), and 30 degrees for right lateral flexion (normal 30). (Tr. 182). Broussard's straight leg raising tests were slightly positive on the left and right. (Tr. 183). X-rays showed that there was some narrowing of the posterior aspect of L5-S1 with a grade ½ to 1 retrololethesis of L5 on S1. X-rays also showed a dissolution of the fusion on the left side. Dr. Heitkamp reported that he believed that Broussard would need surgery in the future. He stated that Broussard should do no work that would require her to make sudden movements with her neck or hold her neck at odd angles; should do no lifting of items over 20 lbs. occasionally; and should do no prolonged standing, squatting, climbing, or lifting of children. He reported that she could do some limited work in a seated position. (Tr. 183).

On June 26, 2001, Dr. Blanda examined Broussard and reported that she continued to complain of low back pain with activity. Repeat EMGs showed subacute left S1 radicular changes. (Tr. 235). Back pain was again reported by Broussard on August 28, 2001 and November 27, 2001, (Tr. 234-345), although x-rays showed satisfactory position of the pedicle

---

[2] ACF surgery is used to treat pain resulting from disc material impinging upon the cervical spine. The surgery involves removing the disc material and replacing it with a graft which is supposed to maintain the disc space while the body forms new bone between the vertebrae, thereby fusing them together.

screw in her back and good bone growth. Dr. Blanda noted that Broussard was being treated by Dr. Daniel L. Hodges, a doctor of physical medicine and pain management, for pain management, which included hyrdrocodone. On March 27, 2002, Dr. Hodges reported that Broussard continued to have low back pain that worsened with activity. (Tr. 239). On May 29, 2002, Dr. Hodges reported that Broussard had restricted range of motion of the lumbar spine and pain on hyperextension, lateral bending and rotation. She also had moderate sciatic notch tenderness on the left side. Dr. Hodges reported that Broussard was suffering from failed back syndrome with persistent lumbosacral radiculitis. (Tr. 238). Also on this date, Dr. Hodges wrote a letter stating his belief that Broussard qualifies for disability benefits under the musculoskeletal section (Listing 1.05C). (Tr. 246).

Dr. Hodges referred Broussard to Dr. Matthew Mitchell, an anesthesiologist and pain managements specialist, who examined Broussard on September 9, 2002. Dr. Mitchell reported that Broussard was experiencing back spasms, and he stated that she would benefit from an epidurolysis (RACZ) procedure.[3] (Tr. 256-57). On September 18, 2002, a CAT scan of Broussard's lumbar spine showed a small ventral extradural defect at L4-5 consistent with disc bulge; a left S2 nerve root sheath that was not well filled; spondylosis at L4-5 with diffused annular bulge and facet arthropathy and ligamentous buckling; and effacement of the thecal sac with no evidence of stenosis. (Tr. 247). Broussard underwent a RACZ procedure on September 25, 2002 for lumbar radiculopathy. (Tr. 251-52).

---

[3] Epidurolysis is used to dissolve some of the scar tissue from around entrapped nerves in the Epidural space of spine, so that medications such as cortisone can reach the affected areas.

Broussard went to the emergency room at University Medical Center on November 16, 2003 complaining of severe back and neck pain. (Tr. 277). X-rays showed a spine abnormality, and a CAT scan was recommended. The scan of Broussard's lumbar spine, taken on November 18, 2003, showed degenerative disc disease at L4-5 with disc space narrowing. (Tr. 279). A scan of Broussard's cervical spine showed mild degenerative disc disease with disc space narrowing at C5-6, and reversal of the usual cervical lordosis with associated spondylosis. (Tr. 280).

### *Mental Impairments*

At the request of Disability Determinations Services, Broussard was examined by Dr. Alfred E. Buxton, a clinical psychologist, on April 4, 2001. Dr. Buxton noted that Broussard had good social skills; even pace with regular rate of performance; normal intellect; good judgment reasoning, insight, and reflective cognition; even mood; and clear and cogent cognititions. (Tr. 185). Dr. Buxton noted that Broussard complained of back pain and brief crying spells secondary to her stress and pain. (Tr. 185-86). Dr. Buxton diagnosed Broussard with chronic pain disorder with degree of impairment moderate and prognosis guarded, as well as chronic adjustment disorder with mixed anxiety and depressed mood, with degree of impairment moderate and prognosis fair. Dr. Buxton assessed Broussard with a G.A.F. score (Global Assessment of Current Functioning) of 60.[4] Dr. Buxton reported that, with positive feedback,

---

[4] The Attorneys' Textbook of Medicine provides the following explanation of GAF scoring:

> The GAF Scale indicates psychological, social, and occupational functioning on a hypothetical continuum from 90 through 81 (absent or minimal symptoms of mental illness) to transient symptoms (scores of 71 through 80) to mild (scores of 61 through 70) to moderate (scores of 51 through 60) to serious (scores of 41 through 50); scores decline with greater degrees of impaired mental health to the point that the patient shows persistent danger of severely hurting self or others or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear

Broussard could be referred to Louisiana Rehabilitation Services for assessment, training and job placement. (Tr. 186).

## II. Medical Improvement

Broussard contends that the ALJ failed to utilize the proper procedures and standards for the termination of benefits based on medical improvement, and instead, used only the five-step sequential evaluation in concluding that she is not disabled. The undersigned agrees. In Waters v. Barnhart, 276 F.3d 716, 719-20 (5th Cir. 2002), the Fifth Circuit adopted the reasoning of the Tenth, Seventh, Eleventh, and Third Circuits in holding that the medical improvement standard applies to the cessation date in closed period cases, to wit:

> In the typical disability case, a claimant's application for benefits is decided while he is under a continuing disability. Once the application is granted, payments continue in accord with that decision. Termination of the benefits then involves a subsequent hearing--a termination case--in which the Commissioner reviews (and decides whether to terminate) the continued payment of benefits. In contrast, in a closed period case, "the decision-maker determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision." *Pickett v. Bowen*, 833 F.2d at 289 n. 1. *Thus, in closed period cases, the ALJ engages in the same decision-making process as in termination cases, that is, deciding whether (or, more aptly, when) the payments of benefits should be terminated.*

(emphasis added).

Thus, in cases where a claimant seeks a closed period of disability, the Commissioner is required to follow the medical improvement standard in determining whether a claimant's disability ceased on a certain date. As the court stated in Waters, "[t]he primary difference

---

        expectation of death (scores of 10 through 1). A score of 0 is assigned if inadequate information is available.

See Whitzell v. Barnhart, 379 F.Supp.2d 204, 210 (D.Mass.2005).

between the standard employed by the ALJ and the "medical improvement" standard . . . is the allocation of the burden of proof. Under the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled." Waters, 276 F.3d at 718, citing 42 U.S.C. § 423(f); Griego v. Sullivan, 940 F.2d 942, 943-44 (5th Cir. 1991). In contrast, under the five-step sequential evaluation, the burden is on the claimant to show that his impairments prevent him from doing any work.

In the instant case, the ALJ concluded that, after March 31, 2001, Broussard had the residual functional capacity to lift up to 10 lbs. frequently and 20 lbs. occasionally, and could stand for 2 hours in an 8-hour workday with a sit-stand option. This finding is clearly inconsistent with the medical evidence in the record. On March 16, 2001, just fifteen days prior to the date that the ALJ found medical improvement, Dr. Heitkamp reported that x-rays of Broussard's lumbar spine showed dissolution of the fusion on the left, as well as a herniated C5-6 paracentral disc with mild radiculopathy into the right and left trapezius areas. (Tr. 183). In March 2001, Dr. Blanda reported that an examination of Broussard showed neck spasms, and on June 26, 2001, Dr. Blanda noted that repeat EMGs showed suabacute left S1 radicular changes. (Tr. 235). In May 2002, Dr. Hodges reported that Broussard had pain radiating into the left lower extremity and further stated his belief that she qualified for disability benefits due to failed back syndrome with persistent lumbosacral radiculitis. (Tr. 238). Indeed, as recently as November 18, 2003, a CAT scan of Broussard's lumbar spine showed degenerative disc disease at L4-05 with disc space narrowing, (Tr. 279), while a scan of Broussard's cervical spine showed mild degenerative disc disease with disc space narrowing at C5-6 and reversal of the usual cervical lordosis with associated spondylosis. (Tr. 280). Considering the foregoing, the undersigned

concludes that there is substantial evidence in the record demonstrating that Broussard did not experience medical improvement after March 31, 2001, as the ALJ found. Furthermore, the medical evidence is inconsistent with a finding that Broussard can perform a significant range of light work.

### III. **Mental Impairment**

Broussard contends that the ALJ erred in failing to find that her depression is disabling.

The Commissioner utilizes a corollary sequential procedure for determining the merits of mental disability claims. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether mental impairments are severe, and also provides detailed guidelines for making Step 3 determinations as to whether mental impairments meet or exceed severity of mental impairments contained in the Listings, as follows:

1. The ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he or she has a medically determinable mental impairment. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004),[5] citing 20 C.F.R. §404.1520a(b)(1).

2. If a medically determinable mental impairment is found, the ALJ must then rate the degree of functional limitation resulting from the impairment. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(b)(2). To perform this latter step, the ALJ should assess the claimant's degree of functional limitation in four areas: (1) activities of daily living; (2) social functioning; (3) persistence or pace of concentration; and (4) episodes of decompensation. See C.F.R. §404.1520a(c)(3). If the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. Serrano-Diaz v.

---

[5] The undersigned was unable to find any Fifth Circuit cases setting forth the proper procedure for analyzing mental disability claims since the revisions and amendments to 20 C.F.R. §404.1520a in 2000. The revisions and amendments became effective on September 20, 2000. 65 Fed. Reg. 50,746 (August 21, 2000). See Boyd v. Apfel, 239 F.3d 698, 705 n.11 (5th Cir. 2001). The Serrano-Diaz decision is therefore cited as the most succinct summary of the current law that the undersigned was able to find during research for this report and recommendation.

Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1).

3. When a severe mental impairment is found, the Commissioner determines whether the impairment meets or exceeds the requirements of the Listings. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(2) (2002).

4. When the severe mental impairment does not meet Listing requirements, the Commissioner then assesses the claimant's residual functional capacity. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(3) (2002).

The procedure states that if the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, *unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities.* Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1). In the Fifth Circuit, courts must adhere to the standard set forth in Stone v. Heckler, 752 F.2d 1099 (5th Cir.1985) in assessing severity of an impairment. In Stone, the Fifth Circuit declared that severity of an impairment must always be determined with regard to an individual's *ability to perform substantial gainful employment,* and cannot be based on medical severity alone. Moreover, the Fifth Circuit articulated the correct severity standard as:

> [A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.

Stone, 752 F.2d at 1101. The court further stated that "[W]e will in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an

express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used." Id. at 1106.

In the instant case, it does not appear that the ALJ applied the mental impairment analysis mandated by the Regulations, as is evidenced by her failure to make specific findings regarding Boudreaux's limitations in the four areas of functioning listed in §404.1520a(c)(3). Nevertheless, the record shows that Dr. Buxton found no major limitations in the area of activities of daily living, and that Broussard had "good" social skills, "even" pace, good judgment, reasoning, insight, and reflective cognition, and clear and cogent cognititions. (Tr. 185). These findings are inconsistent with disabling depression. Considering the foregoing, the court concludes that, despite the ALJ's failure to properly assess Broussard's mental functioning under the appropriate standard, there is substantial evidence in the record supporting the ALJ's conclusion that Broussard's depression is not disabling. Consequently, this claim is without merit.

### IV. Testimony of Vocational Expert

Finally, Broussard contends that the ALJ improperly relied on the testimony of the vocational expert, which was based on an erroneous hypothetical question inasmuch as the question did not include Broussard's mental impairment in her residual functional capacity.

The court has already concluded that Broussard does not suffer from a disabling mental impairment. Furthermore, the court has concluded that the ALJ's residual functional capacity assessment was erroneous in that it reflected an ability to lift up to 10 lbs. frequently and up to 20 lbs. occasionally, findings that are inconsistent with the medical evidence in the record. Because the court has already concluded that the ALJ's residual functional capacity assessment was

erroneous, any hypothetical question posed to the VE that incorporates that RFC is also erroneous. Nevertheless, because the court has already concluded that Broussard is entitled to benefits, a detailed discussion of this alleged error is not necessary.

### *Conclusion*

Considering the foregoing, the decision of the Commissioner is **AFFIRMED IN PART AND REVERSED IN PART.** The decision is **AFFIRMED** insofar as the Commissioner found Broussard disabled as of February 1, 2000, and **REVERSED** insofar as the Commissioner found Broussard's disability ceased as of March 31, 2001. It is therefore **ORDERED** that Broussard be awarded disability benefits consistent with an onset date of February 1, 2000.

Signed at Lafayette, Louisiana, on November 14, 2005.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)